Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
Panel Especial

| | | |
|---|---|---|
| NEODECK HOLDING CORP. NEODECK SOFTWARE CORP.<br><br>Apelantes<br><br>v.<br><br>TRIPLE-S MANAGEMENT, CORP.; THURMAN JUSTICE; COMPAÑÍA DE SEGURO B<br><br>Apelados | KLAN202401142 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Caso. Núm. SJ2024CV02511<br><br>Sobre: Declaración y Daños<br><br><br>Consolidado |
| TRIPLE-S MANAGEMENT, CORP.<br>Apelado<br><br>v.<br><br>ROBERTO TORRES; RICARDO PINEDA THEN; Y NEODECK HOLDINGS CORP.<br>Apelantes | | *Certiorari* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Caso. Núm. SJ2024CV03325<br><br>Sobre: Injunction Estatutario al Amparo de los Artículos 7.01 (D), 7.10 y 7.15 de la Ley General de Corporaciones |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Adames Soto y la Jueza Santiago Caderón

Adames Soto, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 15 de diciembre de 2025.

Comparecen, mediante recurso de *Apelación*, NeoDeck Holdings, Corp. (ND Holdings), NeoDeck Software, Corp. (ND Software) (en conjunto, NeoDeck), el señor Roberto Torres (señor Torres) y el señor Ricardo Pineda

Then (señor Pineda) (en conjunto, Apelantes) y nos solicitan que revoquemos la *Sentencia Parcial* que emitió el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI), el 22 de noviembre de 2024. En dicho dictamen, el foro apelado declaró Con Lugar la *Moción de Sentencia Sumaria Parcial* que presentó Triple-S Management Corp. (Triple-S o Apelado) y Sin Lugar la *Solicitud de Sentencia Sumaria Parcial* que sometieron los Apelantes. En lo esencial, mediante dicho dictamen el foro primario acogió la teoría legal propulsada por Triple-S, en el sentido de que la fusión de este y GuideWell Merger, Inc. (GuideWell Merger), no conllevó una transferencia directa o indirecta de las acciones Clase B que Triple-S ostenta en ND Holdings, que activara la cláusula de compra preferente suscrita con NeoDeck.

Contrario a lo decidido por el TPI, NeoDeck afirma que la referida fusión sí constituyó una transferencia indirecta de las acciones del Apelado en ND Holdings, por tanto, se requería que Triple-S cumpliera con las obligaciones acordadas en el *Shareholders Agreement* (Acuerdo de Accionistas) cuando una situación tal sucediera.

Según era de esperarse, Triple-S opuso a ello que el TPI estaba en posición de disponer de la moción dispositiva ante su atención, según lo hizo, ante el hecho de que la prueba documental con la que se acompañó su petición de sentencia sumaria estableció que la fusión no tuvo como efecto variación en su posición como accionista de ND Holdings, habiendo subsistido como empresa superviviente, por lo que no operó la transferencia esgrimida por la parte Apelante.

Evaluados los asuntos ante nuestra consideración, particularmente la prueba documental con la cual se propusieron las partes promover sus teorías legales, determinamos que la prueba documental que obra en autos resulta suficiente en derecho para *Confirmar* la Sentencia Parcial apelada.

## I. Resumen del tracto procesal

Limitándonos a los datos pertinentes a nuestra intervención, en 2010, NeoDeck y Triple-S suscribieron el Acuerdo de Accionistas[1] y un *Stock Purchase Agreement (Stock Purchase)*.[2] De conformidad con el Acuerdo de Accionistas, Triple-S se convirtió en accionista minoritario de ND Holdings, después de pagar la suma de $500,000.00 a cambio de 510,000 acciones en ND Holdings.[3] De esta forma Triple-S poseería el 48.5% de la Acciones Comunes Clase B de ND Holdings, mientras que ND Software sería el accionista mayoritario con un 51.5% de las Acciones Comunes Clase A.[4]

Mediante el Acuerdo de Accionistas y los *By-Laws of Neodeck Holding Corp.* (Reglamento),[5] las partes acordaron las normas, obligaciones y responsabilidades que regirían la relación comercial. En lo pertinente a la controversia ante nosotros, en el Artículo III, sec. 3.01 del Acuerdo de Accionista se incluyó un "Restriction of transfer", que estableció la referida prohibición a la transferencia directa o indirecta de la totalidad o parte de las referidas acciones, salvo que acontecieran unos supuestos allí estipulados. En el mismo Artículo se dispuso sobre los derechos de las partes ante un posible ofrecimiento de transferencia de acciones por un tercero, incluyendo el derecho de adquisición preferente, y las consecuencias de su incumplimiento[6].

Habiendo transcurrido varios años de haberse suscrito el Acuerdo mencionado, el 23 de agosto de 2021, Triple-S, GuideWell Merger y GuideWell Mutual Holdings Corporation (GuideWell Mutual) suscribieron un acuerdo intitulado *Agreement and Plan of Merger*, mediante el cual GuideWell Mutual se fusionaría en Triple-S, siendo la primera absorbida

---

[1] Apéndice de los apelantes, págs. 466-499.
[2] Apéndice de los Apelantes, págs. 463-499 y 569-592.
[3] *Id.*
[4] *Id.*
[5] *Id.*, págs. 463-499, 816-830.
[6] Apéndice del apelante, pág. 471-477.

por la segunda, y, a su vez, Triple-S "becoming a wholly owned subsidiary" de GuideWell Merger.[7]

Pasado algún tiempo de la referida transacción comercial, NeoDeck le dirigió una misiva a Triple-S imputándole haber violentado la Sección 3.07 del Acuerdo de Accionistas, como consecuencia de haber participado en la fusión.[8] Sostuvo que dicha fusión constituyó una transferencia indirecta de las acciones de Triple-S en ND Holdings, que requería un aviso previo a los accionistas de esta última, el cual no se hizo, de manera que pudieran ejercer su derecho de adquisición preferente o *Right of First Refusal*. Por tanto, NeoDeck le notificó su decisión de revocar y cancelar las acciones de Triple-S en ND Holdings y la eliminación como accionista de los récords corporativos.

En respuesta, Triple-S le cursó una carta a ND Holdings refutando sus señalamientos.[9] Aseguró que la fusión ejecutada no constituyó una transferencia de sus acciones en ND Holdings, pues resultó la entidad superviviente, en consecuencia, continuó como la tenedora de las acciones en ND Holdings. A su vez, cuestionó la decisión "unilateral" de ND Holdings de revocar y cancelar sus acciones, sin poseer la autoridad para ello. En una comunicación posterior, Triple-S le exigió a ND Holdings el cumplimiento de sus obligaciones conforme al acuerdo suscrito.[10] Por último, esta solicitó la calendarización de las reuniones de la junta de directores y sus accionistas, y la divulgación de la información financiera.[11]

Es así como, el 15 de marzo de 2024, NeoDeck presentó *Demanda de Sentencia Declaratoria y Daños* contra Triple-S[12]. Según lo anticipa su título, NeoDeck solicitó, entre otros asuntos, que el foro de instancia

---

[7] *Id.*, págs. 635-725.
[8] *Id.*, págs. 1070-1072.
[9] *Id.*, págs. 1076-1078.
[10] *Id.*, págs. 1084-1086.
[11] *Id.*
[12] *Id.*, págs. 1-22. Posteriormente, la Demanda fue enmendada para incluir a otras partes. Véanse las págs. 157-175 en el Apéndice de los Apelantes.

emitiera una sentencia declaratoria sobre el efecto que tuvo la fusión que llevó a cabo Triple-S y GuideWell Mutual en las acciones de Triple-S en NeoDeck. **Como primera causa de acción, NeoDeck solicitó que el TPI declarara que, en virtud de dicha fusión, Triple-S transfirió indirectamente a GuideWell las acciones que tenía en NeoDeck.** También, solicitó que se decretara que la transferencia indirecta de las acciones de Triple-S a GuideWell fue nula, pues se hizo sin que Triple-S reconociera el derecho de adquisición preferente que tenía NeoDeck, según establecido en la Sección 3.03 del Acuerdo de Accionistas. Finalmente, exigió que declarara que NeoDeck tenía derecho a revocar y cancelar las acciones comunes Clase B de Triple-S, los correspondientes certificados y terminar con su derecho al voto, a los dividendos y al acceso a los libros corporativos de NeoDeck.[13]

Por su parte, Triple-S presentó *Demanda de Injunction Estatutario al amparo del Art. 7.15 de la Ley General de Corporaciones.*[14]

A tenor, el TPI señaló una vista de *injunction.* Sin embargo, después de que las partes presentaran una *Moción Conjunta sobre Estipulaciones para Vista de Injunction* [...][15], el foro de instancia canceló la vista de *injunction* con la anuencia de estos.[16]

Luego del foro apelado atender múltiples asuntos procesales, el 24 de junio de 2024, Triple-S presentó su *Contestación a "Demanda Enmendada de Sentencia Declaratoria y Daños" y Reconvención y Demanda contra Terceros.* En su respuesta, Triple-S negó la mayoría de las alegaciones en su contra.[17] Aseguró, además, que mediante la fusión no hubo una disposición o transferencia directa o indirecta de las acciones de Triple-S en ND Holdings que activara el derecho de adquisición preferente establecido en el Acuerdo de Accionistas. Mientras, en su *Reconvención* y

---

[13] *Id.*
[14] Caso núm. SJ2024CV03325. Véase, Entrada 8 de SUMAC.
[15] Véanse, Entradas 34 y 35 de SUMAC, caso núm. SJ2024CV02511.
[16] *Id.*, Entrada 42.
[17] Apéndice de los Apelantes, págs. 1140-1342.

*Demanda contra Terceros* solicitó que: (1) se dictara sentencia declaratoria; (2) ordenara a las partes reconvenidas a cumplir con sus obligaciones contractuales; (3) se impusiera a las partes reconvenidas y a los Terceros Demandados, según sea el caso, la obligación de resarcir los daños causados a Triple-S; (4) proveyera los remedios solicitados, según previsto en la Sección 5.04 del Acuerdo de Accionistas; y (5) le concediera una suma no menor de $350,000.00, por concepto de honorarios de abogados. También, en la misma fecha, Triple-S solicitó la eliminación de las imputaciones de fraude que presentó NeoDeck en su contra.[18]

Por último, Triple-S presentó una *Moción de Sentencia Sumaria Parcial*.[19] La inició aseverando no había controversia sobre las obligaciones de las partes plasmadas en el Acuerdo de Accionistas, y los "mínimos hechos necesarios para que este Honorable Foro esté en posición de resolver la cuestión de umbral planteada... surgen de la prueba y los hechos que las partes de epígrafe ya estipularon para dicho caso"[20]. Entonces, identificó la controversia a dilucidar como "**qué efecto, si alguno, tuvo la fusión en cuestión sobre las obligaciones dimanantes del acuerdo de accionistas en cuanto al derecho de adquisición preferente que dicho acuerdo le reconoce que los accionistas de ND Holdings y a la propia corporación**".[21] (Énfasis provisto). Luego aseveró que la prueba documental presentada demostraba que **la fusión no había supuesto transferencia indirecta alguna y que nunca dejó de ser accionista de ND Holding, y que continúa como accionista de NeoDeck**[22]. A tenor, enumeró treinta y dos hechos que calificó de esenciales y pertinentes, con alusión a la prueba documental para sostenerlos. Finalizó con la discusión del derecho que juzgó aplicable y sostenía la concesión del remedio solicitado.

---

[18] *Id.*, págs. 1343-1349.
[19] *Id.*, págs. 1350-1379 y 1380-1385.
[20] Id, pág. 1351.
[21] Id.
[22] *Id.*

Mediante la *Resolución RPC 38.2 y Orden*, el foro de instancia bifurcó los procedimientos para atender, en primer lugar: la controversia sobre la tenencia de las acciones de Triple-S en NeoDeck; la condición de accionista de Triple-S, la interpretación del Acuerdo de Accionistas; los efectos de la fusión sobre la tenencia de las acciones de Triple-S; y las facultades de NeoDeck para cancelar las acciones de Triple-S.[23] Ello, con el fin de resolver la solicitud de remedio interdictal y la petición de sentencia declaratoria. Entonces, en una segunda etapa, adjudicaría las causas sobre daños contractuales o extracontractuales.[24]

Como respuesta, inicialmente NeoDeck instó una *Oposición a moción de reconsideración (entrada núm. 50 de SUMAC) y moción bajo la Regla 36.6 de Procedimiento Civil para llevar a cabo descubrimiento de prueba para oponerse a la moción de sentencia sumaria parcial de Triple-S Management Corp.*[25] En lo que concierne, adujo que, para estar en posición de oponerse a la petición de sentencia sumaria y dilucidar los efectos de la fusión en la tenencia de las acciones, antes resultaba necesario deponer a varios testigos de Triple-S que intervinieron en ella.

Luego de que Triple-S objetara mediante escrito tal solicitud de descubrimiento de prueba, el TPI la declaró Sin Lugar, el 24 de julio de 2024[26].

Ante tal resultado, NeoDeck presentó *Oposición a Moción de Sentencia Sumaria Parcial y Solicitud de Sentencia Sumaria Parcial*[27]. Sostuvo que Triple-S había suscrito el referido acuerdo de fusión con el fin de transferir indirectamente sus acciones en ND Holdings a GuideWell Holding, ocultando detalles de la transacción y dando información falsa, lo que activó su derecho a la adquisición preferente, según lo disponía el Acuerdo de Accionistas. En la misma tónica, afirmó que GuideWell había

---

[23] *Id.*, págs. 1397-1399.
[24] *Id.*
[25] *Id.*, pág. 1490-1505.
[26] *Id*, pág. 1534.
[27] *Id*, pág. 1535.

adquirido todos los activos y las acciones de Triple-S, "concretizándose el cambio de control que los accionistas anticiparon en la reunión del 21 de junio de 2016". Como consecuencia, solicitó que el TPI determinara que Triple-S ya no era accionista de ND Holdings, "toda vez que esta última ejerció su derecho de adquisición preferente, pagó el mismo precio que GuideWell-cero-, y actuó conforme a la Sección 3.07 del Acuerdo de Accionistas al exigir primero el cumplimiento específico y luego optar por un remedio en equidad, el cual fue cancelar las acciones de Triple-S"[28].

Entonces, en la misma moción ND Holdings procedió a contestar los hechos identificados por Triple-S como incontrovertidos, para, a renglón seguido proponer los hechos que entendía incontrovertidos, (una lista de sesenta y cuatro hechos). A partir de ello, afirmó que: el Acuerdo de Accionista había sido novado, como resultado de una reunión de accionistas realizada el 22 de junio de 2016, en el que se definió el término transferencia indirecta y se determinó bajo qué circunstancias se activaría el *Right of Refusal;* la referida transferencia indirecta resultaba nula, pues no se cumplieron los pasos para ello, sin reconocerse el referido *Right of Refusal;* como consecuencia, NeoDeck tenía el derecho de revocar y cancelar las acciones de Triple-S; no se podía alzar la defensa de "actos propios" al imputarle a NeoDeck que continuó permitiendo la participación de Triple-S en los asuntos de la corporación posterior a la fusión, pues el Acuerdo de Accionistas contiene una cláusula que establece la no renuncia del derecho a plantear un asunto tal.

Es así como, examinadas las referidas mociones dispositivas, junto a sus respectivas oposiciones, y la prueba documental ante sí, el TPI dictó la *Sentencia Parcial* cuya revocación nos solicita la parte apelante, determinando que no existía controversia sustancial sobre los siguientes hechos materiales:

1. Triple S Management Corp. (Triple-S) es una corporación organizada al amparo de las leyes de Puerto Rico. Triple-S tiene

---

[28] *Id.*

oficinas principales en: 1441 Avenida Roosevelt, San Juan, Puerto Rico. Su dirección postal es la siguiente: P.O. Box 363628, San Juan, Puerto Rico 00936-3928; y su número de teléfono es el (787) 749-4949.[29]

2. NEODECK HOLDINGS CORP. (ND Holdings) es una corporación organizada bajo las leyes de Puerto Rico que se dedica al diseño y creación de programación de computadoras y a la prestación de servicios para la industria de la salud, y, entre éstos, autoriza el licenciamiento de la aplicación de manejo de récords médicos Neomed, su principal activo. La dirección física y postal de ND Holdings es 2053 Ponce Bypass, Suite 209, Ponce, Puerto Rico 00717-2138. Su número de teléfono es el (787) 651-4444.[30]

3. El 2 de agosto de 2010, Triple-S, ND Software y ND Holdings suscribieron acuerdo de accionistas titulado Shareholders Agreement Between Neodeck Holdings, Corp., Triple-S Management Corp., And Neodeck Software Corp. (Shareholders Agreement) y un Stock Purchase Agreement (SPA).[31]

4. A tenor con el Stock Purchase Agreement (SPA), ND Software adquiriría 3,060,000 acciones comunes Clase A en ND Holdings a cambio de una contribución de activos valorados en $3,000,000, mientras que Triple S adquiriría 510,000 acciones comunes Clase B en ND Holdings a cambio de $500,000 en efectivo:

   [...][32]

Aunque el SPA no contiene un Exhibit 4.01, el Exhibit 1.0 indica "Name of Shareholder", "Purchase Price" y "Number of Shares" para tanto ND Software como para Triple S.

5. A tenor con el Shareholders Agreement, ND Software y Triple S, habiendo acordado formar la entidad ND Holdings y siendo sus únicos accionistas en las proporciones acordadas, limitaron y condicionaron el traspaso de sus acciones. Triple S además se comprometió a hacer ciertas contribuciones de capital, a cambio de las cuales adquiriría acciones adicionales en la empresa:

   [...][33]

6. Triple-S hizo aportaciones bajo la sección 6.21 del Shareholders Agreement hasta adquirir 2,430,000 acciones comunes Clase B adicionales. Entrada 66-I. Lo cual representa un total de 2,940,000 acciones y una inversión de $2,881,200 por parte de Triple-S. [Operación aritmética sencilla] De esta manera, Triple-S advino accionista con un 48.5% de las acciones, siendo ND Software la accionista mayoritaria con el 51.5% de las acciones.[34]

7. Los estatutos de ND Holdings se incorporaron como Exhibit C al y forman parte del Shareholders Agreement.

8. Al momento de firmarse el Shareholders Agreement y el SPA, Triple-S era una corporación pública cuyas acciones se cotizaban en la bolsa de valores y, por consiguiente, estaban

---

[29] Hecho estipulado, Entradas 38 y 63.
[30] *Id.*
[31] *Id.*
[32] Véase, Apéndice de los Apelantes, págs. 569, 580, 584-588 y 590.
[33] *Id.*, págs. 466-468, 471-473, 476-477, 484-485, 491 y 497.
[34] Entrada 66-2, ¶ 11 de SUMAC.

sujetas a transacciones de compraventa diarias, en función de las cuales bien pudiera cambiar la titularidad sobre Triple-S.[35]

9. Según los apuntes de Ricardo Pineda Then, accionista mayoritario de ND Software y Secretario de ND Holdings, en la reunión de accionistas de ND Holdings celebrada el 21 de junio de 2016 (la Minuta)[36], se discutió "la intención de los accionistas de [ND Software] de vender su participación en [ND Holdings]."[37]

El Sr. Francisco Martorell [Representante del Accionista Class B en la reunión] pregunta si va a ser una venta directa de las acciones de [ND Holdings] o las acciones de [ND Software] que sería una transferencia indirecta según establecido en la sección 3.08 del artículo 3 del Shareholder Agreement.

El Sr. Martorell menciona el derecho de Right of First Refusal establecido en la sección 3.03 y aclara que cualquier cambio del 50% o más de las acciones de uno de los accionistas, [ND Software] o Triple-S [], a una sola entidad o persona constituye una transferencia indirecta y se activa el Right of First Refusal.

Los representantes de [ND Software] están de acuerdo con la interpretación del Sr. Francisco Martorell, mas se le aclara que no [h]a habido transferencia de más de 50% a una sola entidad o persona de las acciones de [ND Software]."[38]

10. Al 11 de agosto de 2021, "the Class B Common Stock Shareholder is Triple-S Management Corporation."[39]

11. Al 23 de agosto de 2021, Triple-S, GuideWell Merger, Inc., y GuideWell Mutual Holdings Corporation suscribieron un documento intitulado Agreement and Plan of Merger (Acuerdo de Fusión). Hechos Estipulados, Entradas 38 y 63. Conforme al cual GuideWell Merger, Inc.-- subsidiaria 100% de GuideWell Mutual Holdings Corporation (Entidad Matriz)-- se fusionó con Triple-S, y GuideWell Merger, Inc. fue absorbida por Triple-S, siendo ésta última la entidad superviviente de dicha Fusión. Entrada 35-5 sección 1.01. Las acciones de la Entidad Matriz en GuideWell Merger, Inc. se convirtieron en acciones en Triple-S. Entrada 35-5 sección 2.01(a). Las acciones en cartera de Triple-S, las acciones en Triple-S que poseían GuideWell Merger, Inc. o la Entidad Matriz previo a la fusión fueron canceladas. Las acciones de otros accionistas en Triple-S fueron canceladas a título oneroso (Merger Consideration). Entrada 1-3 sección 2.01(b, c y d). De esta manera, la Entidad Matriz quedó como único accionista de Triple-S, cuyas acciones ya no cotizan en bolsa. El pago del Merger Consideration fue a cuenta y cargo de la Entidad Matriz.[40]

---

[35] R. Evidencia 201, https://www.sec.gov/edgar/search/#/q=triple%2520s%2520management&dateRange=custom&category=form-cat1&startdt=2010-01-01&enddt=2010-12-31

[36] "ND Holding propuso el proceso de preparación y aprobación de las minutas como un hecho incontrovertido, que no hemos adoptado por no ser consistente con la prueba ofrecida. Por ejemplo, no surge de la "Minuta" del 21 de junio de 2016 que se haya leído y aprobado la minuta de la reunión anterior. Tampoco se ofreció evidencia que la Minuta del 21 de junio de 2016 fuera aprobada en la próxima reunión, por lo cual nos vemos impedidos de adjudicar que se trata de una minuta de la empresa".

[37] Entrada 66-1A de SUMAC.

[38] *Id.*

[39] Entrada 35- 3 a la pág. 10.

[40] Entrada 1-3 sección 2.01(d).

12. Aunque el Acuerdo de Fusión no conllevó una compra de acciones en Triple S por la Entidad Matriz o cualquiera de sus subsidiarias ni tampoco un traspaso de acciones en Triple S a la Entidad Matriz—sino que las acciones de la Entidad Matriz en Guidewell Merger se convirtieron en acciones en Triple S como ocurriría en cualquier fusión en cuanto a las acciones en la entidad absorbida[41] -- el efecto del negocio jurídico fue que la Entidad Matriz Guidewell pasó a ser dueña de todas las acciones en Triple S.[42]

13. Triple-S no le notificó a ND Holdings del Acuerdo de Fusión.[43]

14. A partir de agosto de 2021, la Fusión fue reiteradamente reseñada por la prensa. Incluyendo en las publicaciones locales Sin Comillas, El Vocero, El Nuevo Día, Noticel.[44]

15. El Acuerdo de Fusión fue efectivo el 1 de febrero de 2022.[45]

16. El 11 de febrero de 2022, Triple-S presentó ante la Securities Exchange Commission un "CERTIFICATION AND NOTICE OF TERMINATION OF REGISTRATION" informando que había pasado a ser una subsidiaria de Guidewell.

> On August 24, 2021, Triple-S Management Corporation, a Puerto Rico corporation ("Triple-S"), GuideWell Mutual Holding Corporation, a Florida not-for-profit insurance holding company ("GuideWell"), and GuideWell Merger, Inc., a Delaware corporation and a wholly owned subsidiary of GuideWell ("Merger Sub"), announced that they entered into an Agreement and Plan of Merger, dated as of August 23, 2021 (the "Merger Agreement"), providing for GuideWell to acquire Triple-S. Pursuant to the Merger Agreement, Merger Sub was merged with and into Triple-S on February 1, 2022 (the "Merger"), with Triple-S surviving the Merger as a wholly owned subsidiary of GuideWell.

> Cuya información advino pública en esa fecha y disponible a cualquier persona a través del portal EDGAR[46] de la SEC.

---

[41] "Una fusión no puede tener el efecto de anular a los accionistas de la entidad absorbida, por los cual sus acciones se convierten en acciones en la entidad sobreviviente sujeto a la tasa de conversión aplicable o convenida".

[42] *Id.*

[43] Entrada 66-2 ¶ 32, 34.3. "ND Holdings y ND Software proponen una serie de hechos incontrovertidos relacionados a las divulgaciones hechas u omitidas por Triple S a sus accionistas y a la Securities Exchange Commission con relación al Acuerdo de Fusión, las cuales no hemos adjudicado por ausencia de materialidad. También solicitan que adjudiquemos las motivaciones y estrategias de Triple S durante la consumación de la Fusión y cómo habría reaccionado Guidewell en diversos escenarios, a base de la declaración de Torres, sin demostrar la competencia de su testimonio para lo que se pretende probar".

[44] Enlaces omitidos.

[45] https://www.sec.gov/edgar/search/#/ciks=0001171662&entityName=TRIPLE-S%2520MANAGEMENT%2520CORP%2520(CIK%25200001171662). "ND Holdings y ND Software proponen que adjudiquemos el contenido o efecto de la fusión a base de las notas contenidas en estados financieros auditados de Triple S disponibles en el Departamento de estado, lo cual no haremos. Los estados financieros auditados, necesariamente son documentos preparados por terceros producto de un examen independiente de la información financiera de una persona o empresa auditada. La opinión de un tercero no puede constituir una admisión de parte".

[46] "EDGAR, the Electronic Data Gathering, Analysis, and Retrieval system, is the primary system for companies and others submitting documents under the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, and the Investment Company Act of 1940. Containing millions of company and individual filings, EDGAR benefits investors, corporations, and the U.S. economy overall by increasing the

https://www.sec.gov/edgar/search/#/ciks=0001171662
&entityName=TRIPLE-
S%2520MANAGEMENT%2520CORP%2520(CIK%252000
01171662)

17. Luego del Acuerdo de Fusión, ND Holdings y ND Software siguieron reconociendo a Triple-S como accionista minoritaria en ND Holdings. A tales efectos, Triple-S siguió recibiendo información sobre asuntos corporativos y financieros, y los directores nominados por Triple-S continuaron participando de reuniones de la junta de directores.[47]

   a. Según la minuta, en la reunión de directores del 10 de noviembre de 2022 participaron tres representantes del accionista clase B.[48]
   b. Hasta el 10 de julio de 2023, Triple-S recibió de ND Holdings correos electrónicos con información financiera de ND Holdings requerida bajo el Acuerdo de Accionistas.[49] ("The purpose of this workbook is to aid to in the preparation of the monthly consolidated financial statements. This reporting package must be delivered to triple S Management no later than the 10th day of each month").[50] Cuya información financiera abarca periodos hasta el 30 de junio de 2023, inclusive.

18. El 7 de julio de 2023, ND Holdings cursó una misiva a Triple-S[51], en la cual imputó a Triple-S haber incumplido la Sección 3.07 del Acuerdo de Accionistas. En esencia, ND Holdings planteó que la Fusión supuso una "transferencia indirecta" de las acciones de Triple-S en ND Holdings, lo cual contravino la aludida sección al no habérsele reconocido su presunto derecho de adquisición preferente.[52] "As a result [ND Holdings] does not recognize Guidewell Mutual Holding Corporation as a shareholder of [ND Holding] under the Shareholders Agreement."[53] En esa carta, Torres hace referencia a una conversación con Martorell donde este aparentemente informó que en la Fusión no se asignó un valor específico a las acciones de Triple S en ND Holding, infirió de ello que el precio imputable al "traspaso indirecto" era cero y exigió el retracto a su favor sin contraprestación.[54]

---

efficiency, transparency, and fairness of the securities markets."
https://www.sec.gov/submit-filings/about-edgar
[47] Entrada 35-3, 4 y 10 al 19.
[48] Entrada 66-F.
[49] Entrada 35-14 a 19.
[50] Entrada 35-19.
[51] Entrada 35-20.
[52] Hecho Estipulado, Entradas 38 y 63.
[53] Entrada 35-20.
[54] *Id* y 66-2 ¶50. "ND Holdings y ND Software proponen como hecho incontrovertido que Guidewell no pagó cantidad alguna por las acciones Clase B a base de las representaciones que Martorell aparentemente hizo a Torres, y que tampoco se les asignaba valor como activo en los estados financieros de Triple S. En primer lugar, no se nos ha justificado que las expresiones de Martorell constituyan una admisión por parte de Triple-S exenta de las limitaciones aplicables a la prueba de referencia. En segundo lugar, las declaraciones imputadas a Martorell resultan insuficientes para inferir que Guidewell obtuvo un interés en las acciones Clase B de gratis. Tercero, no se aportaron pruebas que conlleven descartar el hecho que Triple S tienen una base de más de $2,000,000 en la adquisición de las acciones Clase B. ND Holdings y ND Software también proponen como hecho incontrovertido que Triple S despidió a Martorell luego de las expresiones anteriores, pero no ofrece prueba competente del hecho o su materialidad. En vez, cita una declaración jurada de Torres donde este asevera que se reunió con Thurman Justice después de la carta del 31 de julio de 2023, y que este último despidió a Martorell. Entrada 66-2 ¶58. También proponen como hecho incontrovertido que Triple S sobre estimó sus proyecciones de ingresos para propósitos de

19. El 31 de julio de 2023, ND Holdings por medio del señor Torres cursó otra misiva dirigida a Triple-S[55] en la que fundamentalmente reiteró sus contenciones según expuestas en la carta del 7 de julio de 2023. Además, ND Holdings notificó en esta comunicación la presunta "revocación" y "cancelación" de las acciones de Triple-S, y la eliminación de Triple-S en tanto accionista de los récords corporativos de ND Holdings.[56]

20. El 2 de agosto de 2023, Triple-S dirigió una misiva a ND Holdings negando las imputaciones de divulgaciones falsas en el contexto de la Fusión, negando que la Fusión provocara un traspaso directo o indirecto de las acciones de Triple-S en ND Holdings, y negando que ND Holdings o sus oficiales tuvieran la potestad de dar por canceladas las acciones pertenecientes a Triple-S o eliminar a Triple-S del registro de accionistas.[57]

21. El 10 de agosto de 2023, ND Holdings cursó una comunicación adicional reiterando sus contenciones e invitando a Triple S a dialogar.[58] En esta comunicación, ND Holdings propuso la siguiente interpretación del término "indirect transfer": "This transfer is triggered when control over the entity holding the [ND Holdings] share changes." Notamos, sin embargo, que ni la carta del 10 de agosto de 2023 ni el Shareholders Agreement establecen un umbral o criterio de lo que constituye control.

22. El 15 de agosto de 2023, Triple-S respondió a la comunicación de ND Holdings del 10 de agosto de 2023.[59] En esta carta, Triple-S reiteró su postura, según expuesta en la comunicación anterior del 2 de agosto de 2023, negó las imputaciones hechas por ND Holdings y aceptó la invitación al diálogo.

23. Posteriormente, el 5 de marzo de 2024, Triple S cursó una carta a ND Holdings, citando el Shareholders Agreement, exigió que ND Holdings agendara reuniones de su junta de directores y de sus accionistas, y divulgara cierta información financiera a Triple-S como accionista.[60] También hizo referencia a una reunión de la junta de directores, celebrada el 10 de noviembre de 2022, en la que los miembros de dicha junta nominados por Triple-S participaron, sin que ND Holdings ni ND Software levantaran reparos en torno a la tenencia de las acciones de Triple-S, aun cuando ya para ese entonces el Acuerdo de Fusión había sido suscrito.

24. El 31 de julio de 2023, Rafael Pineda, en calidad de Secretario de ND Holdings, modificó con su puño y letra el Registro de Acciones de NeoDeck Holdings para registrar un traspaso de las acciones Clase B Triple-S Management a NeoDeck Holdings.[61]

25. El 3 de agosto de 2023, ND Holdings y ND Software otorgaron un acuerdo titulado "First Amendment to the Shareholders Agreement" donde las partes expresan y acuerdan entre ellas que:

---

la Fusión, pero no aporta prueba que nos permita adjudicar el hecho o establecer su materialidad".

[55] Entrada 35-21.

[56] Hecho estipulado, Entradas 38 y 63.

[57] Entrada 35-22.

[58] Entrada 35-23.

[59] Entrada 35- 24.

[60] Entrada 35- 25.

[61] Entrada 66-1 e I.

a. ND Holdings adquirió la Acciones Clase B el 3 de agosto de 2023;

b. Ciertas referencias as Triple S en el Shareholders Agreement se tendrían por no puestas, y en otras se sustituiría por ND Holdings.[62]

(Las notas al calce 29 a la 62 son una reproducción *verbatim* de las incluidas por el TPI en la Sentencia apelada, al enumerar sus determinaciones de hechos).

El mismo foro apelado razonó que, aunque el Acuerdo de Accionistas "no define lo que constituye una transferencia directa o una transferencia indirecta", las expresiones sobre lo que es una transferencia indirecta, recogidas en la Minuta de la reunión de accionistas del 21 de junio de 2016, "no satisfacen los requisitos de "prior written consent" que requiere la sección 7.03 del Shareholder Agreement, siendo estos "comentarios que no repercutieron o desencadenaron en acto o conducta alguna". Añadió que, aunque entendiera el "indirect transfer" como un "change in beneficial ownership", la ausencia de criterios o parámetros de control en el Acuerdo de Accionistas, junto a una fórmula que permita computar el precio de compra preferente en caso de un cambio de control, llevaba a concluir que dicho contrato no contempla ni siquiera un derecho de retracto por los cambios en el control del accionista, o por la fusión sufrida por Triple-S. También, aplicó la doctrina de "actos propios" al trato que continuó dando la parte apelante a Triple -S como accionista, a pesar de haber tenido conocimiento con buena anticipación de la fusión efectuada.

En consideración a lo anterior, el TPI declaró Con Lugar la *Moción de Sentencia Sumaria Parcial* que presentó Triple-S, y Sin Lugar la *Solicitud de Sentencia Sumaria Parcial* que sometieron los Apelantes.

---

[62] Entrada 66-H. "Triple S no es parte en el First Amendment to the Shareholders Agreement. Puesto que el Shareholders Agreement no puede ser enmendado sin el consentimiento de Triple S mientras esta fuera accionista de ND Holdings, la validez del First Amendment depende de que ND Holdings haya adquirido las acciones Clase B válidamente".

Inconformes con lo resuelto, los Apelantes acudieron ante este foro intermedio, mediante el recurso de epígrafe, señalando los siguientes errores:

PRIMER ERROR: ERRÓ EL TPI AL NO PONER EN VIGOR LOS REQUISITOS PROCESALES ESTABLECIDOS POR EL TRIBUNAL SUPREMO EN LA DECISIÓN DE ZAPATA BERRÍOS V. JF MONTALVO, 189 DPR 414 (2013).

SEGUNDO ERROR: ERRÓ EL TPI AL NO DARLE VALOR PROBATORIO A LA MINUTA DE LA REUNIÓN DEL 21 DE JUNIO DE 2016 Y EL ESTADO FINANCIERO DE TRIPLE-S MANAGEMENT.

TERCER ERROR: ERRÓ EL TPI EN LA INTERPRETACIÓN DEL ACUERDO DE ACCIONISTAS CON RELACIÓN A LO QUE CONSTITUYÓ UNA TRANSFERENCIA INDIRECTA.

CUARTO ERROR: ERRÓ EL TPI AL NO PERMITIRLE A NEODECK HOLDINGS HACER DESCUBRIMIENTO DE PRUEBA Y LUEGO REPROCHABLE QUE NO PRESENTÓ DETERMINADA PRUEBA QUE SE DESCRIBE EN LA SENTENCIA PARCIAL.

## II. Exposición de Derecho

a.

La sentencia sumaria "vela adecuadamente por el balance entre el derecho de todo litigante a tener su día en corte y la disposición justa, rápida y económica de los litigios civiles". *Ramos Pérez v. Univisión*, 178 DPR 200, 220 (2010). Por lo tanto, el principio rector que debe guiar al juez de instancia en la determinación sobre si procede o no la sentencia sumaria es "el sabio discernimiento", ya que si se utiliza de manera inadecuada puede prestarse para privar a un litigante de su día en corte, lo que sería una violación a su debido proceso de ley. *Mun. de Añasco v. ASES et al.*, 188 DPR 307, 327-328 (2013).

En el caso de revisar sentencias del Tribunal de Primera Instancia dictadas mediante el mecanismo de sentencias sumarias, o resolución que deniega su aplicación, este foro intermedio se encuentra en la misma posición que el foro primario para evaluar su procedencia. *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 115 (2015). Los criterios que debemos seguir al atender la revisión de una sentencia sumaria dictada por el foro de instancia han sido enumerados con exactitud por nuestro

Tribunal Supremo. *Id.*, págs. 118-119; *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679 (2018). A tenor, el Tribunal de Apelaciones debe:

1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, y la jurisprudencia le exigen al foro primario;

2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, supra;

3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, *supra*, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos;

4) y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Id.*, pág. 679.

Sin embargo, al revisar la determinación del TPI respecto a una sentencia sumaria, estamos limitados de dos maneras: (1) solo podemos considerar los documentos que se presentaron ante el foro de primera instancia; (2) solo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. *Meléndez González, et al. v. M. Cuebas, supra*, pág. 118. El primer punto se enfoca en el principio de que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. *Id.*, pág. 115. Mientras que el segundo limita la facultad del foro apelativo a revisar si en el caso ante su consideración existen controversias reales en cuanto a los hechos materiales, pero no puede adjudicarlas. *Id.*

Asimismo, la Regla 36.3 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3, especifica los requisitos de forma que debe cumplir la parte que promueve la moción de sentencia sumaria, así como la parte que se opone a ella. En suma, la parte promovente debe exponer un listado de hechos no controvertidos, desglosándolos en párrafos debidamente numerados y, para cada uno de ellos, especificar la página o el párrafo de la declaración

jurada u otra prueba admisible que lo apoya. *Id.* Ahora bien, "es esencial que de la prueba que acompaña la solicitud de sentencia sumaria surja de manera preponderante que no existe controversia sobre los hechos medulares del caso". *Cruz Cruz v. Casa Bella Corp.*, 213 DPR 980, 993 (2024); *Zambrana García v. ELA*, 204 DPR 328, 341-342 (2020); *Jusino et al. v. Walgreens*, 155 DPR 560, 577 (2001).

En contraste, la parte que se opone a la moción de sentencia sumaria está obligada a citar específicamente los párrafos según enumerados por el promovente que entiende están en controversia y, para cada uno de los que pretende controvertir, detallar la evidencia admisible que sostiene su impugnación con cita a la página o sección pertinente. Regla 36.3 (b) de las de Procedimiento Civil, *supra.* De aquí que la parte que se opone a que se dicte sentencia sumaria no puede descansar exclusivamente en sus alegaciones, ni tomar una actitud pasiva. *Toro Avilés v. P.R. Telephone Co.*, 177 DPR 369, 383 (2009). Por el contrario, debe controvertir la prueba presentada por la parte solicitante, a fin de demostrar que sí existe controversia real sustancial sobre los hechos materiales del caso en cuestión. *González Aristud v. Hosp. Pavía*, 168 DPR 127, 138 (2006). Ello se puede lograr a través de contradeclaraciones juradas y contradocumentos que pongan en entredicho los hechos presentados por el promovente. *Ramos Pérez v. Univisión P.R., Inc., supra,* pág. 215, citando a *Corp. Presiding Bishop CJC of LDS v. Purcell,* 117 DPR 714, 721 (1986).

En cuanto a las declaraciones juradas, la Regla 36.5 de Procedimiento Civil (32 LPRA Ap. V) establece que: "[l]as declaraciones juradas para sostener u oponerse a la moción se basarán en el conocimiento personal del (de la) declarante. Contendrán aquellos hechos que serían admisibles en evidencia y demostrarán afirmativamente que el(la) declarante está cualificado(a) para testificar en cuanto a su

contenido". *Id.*; *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 677 (2018).

b.

Una de las características de la actividad comercial es que las empresas, para alcanzar sus objetivos y fortalecer su posición en el mercado, suelen combinarse con otras entidades comerciales. El efecto de estas combinaciones es que una de las corporaciones termina absorbiendo a las demás entidades, o al menos adquiriendo el control de los activos o de las acciones de estas. C.E. Díaz Olivo, *Corporaciones, Tratado sobre Derecho Corporativo,* 2da ed. rev., San Juan, Ed. AlmaForte, 2022, pág. 400. Véase, además, *D.A.Co. v. Alturas Fl. Dev. Corp.,* 132 DPR 905, 914 (1993). "De ordinario, los arreglos de esta naturaleza comienzan con un acuerdo formal negociado entre dos o más corporaciones. Mediante este acuerdo las acciones de las corporaciones que participan y desaparecen en el proceso, se convierten o permutan por acciones o por activos de la corporación que subsiste o resulta del proceso". Id.

Al respecto, la Ley General de Corporaciones, Art. 10.01. (A) de la Ley Núm. 164-2009 (14 LPRA sec. 3731) dispone:

> Dos (2) o más corporaciones, constituidas al amparo de las leyes del Estado Libre Asociado, podrán fusionarse en una sola corporación, la cual podrá ser cualquiera de las corporaciones constituyentes, o podrán consolidarse en una nueva corporación, tal como se estipule en el acuerdo de fusión o consolidación, según sea el caso, en cumplimiento con este Artículo y aprobado según se dispone en el mismo. Para propósitos de esta Ley, se entenderá que una "corporación doméstica" es una corporación organizada bajo las leyes del Estado Libre Asociado.

El procedimiento general de fusión es complejo ya que requiere la aprobación de los directores y los accionistas de cada una de las entidades participantes en la transacción. La complejidad de este proceso radica en que una fusión o consolidación representa un cambio dramático o sustancial en la operación de la entidad. C.E. Díaz Olivo, *op. cit.,* 14.03, pág. 407.

Sobre el efecto jurídico de una fusión, las corporaciones que desaparecen como parte de la transacción pierden su personalidad jurídica independiente, pero la entidad resultante se convierte automáticamente en titular de todas las propiedades, los derechos y las obligaciones de las corporaciones que desaparecieron. Aun cuando en una fusión pueda desaparecer una o más corporaciones, ya que serán entidades sin personalidad jurídica propia, las mismas no desaparecerán en el sentido económico, puesto que su esencia o sustancia económica seguirá latente a través de la corporación resultante. C.E. Díaz Olivo, *op. cit.*, sec. 14.05, págs. 409-410; *D.A.Co. v. Alturas Fl. Dev. Corp.*, supra, págs. 916-917.

Asimismo, toda acción o procedimiento pendiente, civil, criminal o administrativo, radicado por cualquiera de las corporaciones consolidadas o fusionadas o entablado contra cualquiera de ellas, podrá continuarse como si no se hubiere efectuado la consolidación o fusión; o podrá incluirse en sustitución a la corporación que subsista o se origine de la fusión o consolidación en tal acción o procedimiento. Véase, Art. 10.12. de la Ley Núm. 164-2009 (14 LPRA sec. 3742).

### III. Aplicación del Derecho a los hechos

a.

Los señalamientos de error alzados serán discutidos de manera sucesiva.

Según se advirtió en la exposición de derecho, la revisión de una sentencia sumaria por este foro intermedio acontece *de novo*, lo que nos exige: auscultar la prueba documental presentada por las partes en sus respectivas mociones dispositivas y réplicas para determinar si existen o no hechos en controversia; de no haber controversias de hechos esenciales, auscultar la corrección del derecho aplicado.

Iniciamos por señalar que, examinada la prueba documental ante nuestra atención, no observamos controversias de importancia sobre los

hechos identificados como incontrovertidos por el TPI en su Sentencia, por lo que los acogemos en integridad. Habiendo determinado esto, podemos pasar a considerar de manera directa la controversia principal que se nos requiere dilucidar, según la identificaremos en el próximo párrafo.

Juzgamos que la referida controversia fue delineada de manera satisfactoria en la introducción de la *Moción de sentencia sumaria parcial* instada por Triple-S, según la cual:

> Así las cosas, según Triple-S alegó en su Demanda enmendada y consistentemente ha indicado en comparecencias ante este Honorable Foro, en este caso **no hubo una transferencia directa ni indirecta de acciones de ND Holdings que permitiera invocar el derecho de adquisición preferente (Right of First Refusal) que cualificadamente reconoce el acuerdo de accionistas de dicha entidad**. En todo caso, como se demostrará, lo único que sucedió en este caso es que ocurrió un arreglo de fusión en donde la empresa Triple-S estuvo involucrada y resultó ser la entidad superviviente. **Dicha fusión,** por lo demás, **no configuró un supuesto de transferencia o disposición indirecta de las acciones de Triple-S en ND Holdings** como podrían serlo **una pignoración o un pledge de acciones. Antes y después del arreglo de fusión reseñado, Triple-S (en tanto entidad superviviente de la fusión) fue y continuó siendo accionista en ND Holdings**. Incluso, surge de la prueba documental estipulada por las partes que ND Holdings continuó tratando a Triple-S como uno de sus accionistas por un periodo de más de un año luego de la fusión de la que formó parte Triple-S[63]. (Énfasis y subrayado provistos).

Desde nuestra óptica, y visto que la revisión de una sentencia sumaria por este foro intermedio acontece *de novo*, precisa entonces que determinemos si Triple-S logró establecer como un hecho incontrovertido que, en efecto, la fusión ***no configuró un supuesto de transferencia o disposición indirecta de sus acciones***. Aunque resulte reiterativo, la teoría legal esencial impulsada por Triple-S a través de su moción dispositiva, adoptada por el TPI en la Sentencia apelada, fue que la obligación del "Right of First Refusal" estipulada por las partes en el Acuerdo de Accionistas nunca se activó, en tanto no aconteció transferencia alguna de acciones, directa o indirecta, por la fusión acordada.

---

[63] Entrada Núm. 38 de SUMAC, pág. 4.

A ello opone la parte Apelante, que sí aconteció una transferencia indirecta por causa de la fusión, al GuideWell asumir el control de Triple-S como resultado de dicha transacción.

Entonces, dirigiendo la mirada a la *Moción de sentencia sumaria* instada por Triple-S, para establecer que la fusión no configuró un supuesto de transferencia directa o indirecta de sus acciones, esta propuso los *hechos incontrovertidos* enumerados del 18 al 21, haciendo alusión al Exhibit 5to en particular como prueba documental de ello[64].

La alusión al referido exhibit nos permite atender el primer señalamiento de error alzado por la parte Apelante, según el cual el TPI debió denegar la moción de sentencia sumaria instada por Triple-S, a causa de este último no haber cumplido con los requerimientos exigidos en la Regla 36.3(a)(4) de Procedimiento Civil, supra. Como se sabe, en lo pertinente, la referida regla procesal requiere que la parte promovente de la moción dispositiva precise los párrafos y páginas de la prueba documental ofrecida, para establecer los hechos materiales sobre los cuales no hay controversia sustancial.

Examinada la moción de sentencia sumaria instada por Triple-S, determinamos que tiene razón la parte Apelante al afirmar que, en un buen número de los hechos propuestos como incontrovertidos, esta no se ajustó al cumplimiento estricto de la Regla 36.3(a)(4), supra. En lo puntual, Triple-S falló en especificar en qué páginas o párrafos de la documentación anejada se encontraban los datos que establecían los hechos propuestos como incontrovertidos. Con todo, esta afirmación nuestra no conlleva la concesión del remedio que se solicita en el recurso de apelación pues, como veremos, eventualmente Triple-S sí le proveyó al TPI información suficiente sobre la prueba documental ofrecida, colocando a dicho foro en posición de determinar los hechos esenciales

---

[64] Entrada 38 de SUMAC, págs. 11 y 12.

incontrovertidos y disponer de las controversias medulares ante su consideración.

Explicando primero dónde reside el advertido incumplimiento con la Regla 36.3(a)(4), supra, en su moción de sentencia sumaria Triple-S se limitó a referir al TPI el *Exhibit 5* para establecer como incontrovertidos los hechos que enumeró del 18 al 21[65]. Dicho exhibit no es otra cosa que el *Acuerdo de Fusión*, según suscrito por Triple-S, GuideWell Merger y GuideWell Mutual, **compuesto por 91 páginas**[66]. Al proponer los presuntos hechos incontrovertidos derivados de dicho extenso documento, Triple-S no identificó en dónde, de todas esas páginas y párrafos, se encontraba la información pertinente a lo que adujo, solo proveyendo su interpretación sobre el contenido de este, lo que constituyó un incumplimiento con la Regla 36.3(a)(4) de Procedimiento Civil, supra. La regla procesal citada pone en los hombros de la parte promovente de la moción dispositiva, no del Tribunal, la labor de establecer los hechos que se propone a establecer como incontrovertidos, para lo que no bastaba aludir de manera genérica a un exhibit, sin guiar al Tribunal al lugar preciso donde encontrar en dicho exhibit la información pertinente.

Sin embargo, tal cual lo adelantamos, lo cierto es que, en su *Réplica y oposición a oposición a moción de sentencia sumaria parcial y solicitud de sentencia sumaria parcial*[67], Triple-S sí proveyó los datos necesarios sobre la prueba documental presentada con el propósito de sostener los hechos que impulsó sobre la fusión, que finalmente fueron adoptados por el TPI en la Sentencia apelada. Además, la Regla 36.3(c) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(c) reconoce discreción al foro primario para no considerar los hechos propuestos como incontrovertidos en los que no se hubiese precisado los párrafos o las páginas de la prueba documental, lo que supone la capacidad de aceptarlos o no. A lo que cabe añadir que, al

---

[65] Entrada Núm. 38 de SUMAC, págs. 11-12.
[66] Ver, Entrada 35 de SUMAC, Exhibit 5, Parte 1 y 2.
[67] Entrada Núm. 79 de SUMAC, pág. 28 en adelante.

evaluar la solicitud de sentencia sumaria, los tribunales deben analizar no solo los documentos incluidos en las mociones, sino también aquellos que obren en el expediente. *Torres Pagán et al. v. Mun. de Ponce*, 191 DPR 583, 598 (2014). En este sentido, el foro apelado no estaba obligado a descartar los hechos propuestos como incontrovertidos por incumplimiento con la Regla 36.3(a)(4), en tanto le bastara la prueba documental que obraba en el expediente para adjudicar los hechos esenciales incontrovertidos.

Abundando, en su *Réplica y oposición a oposición a moción de sentencia sumaria parcial y solicitud de sentencia sumaria parcial*, por ejemplo, Triple-S sí precisó que el hecho propuesto como incontrovertido número 18, quedó establecido en la página 10, sección 1.01 del *Acuerdo de Fusión*, dando cumplimiento sustancial a la Regla 36.3(a)(4) aludida. En definitiva, no observamos que el incumplimiento inicial de Triple-S con la regla procesal citada se interpusiera como impedimento fatal para que el TPI pudiera disponer de la petición de sentencia sumaria, según lo hizo.

Superado lo discutido, la referencia al hecho propuesto como incontrovertido por Triple-S, que este identificó con el número 18, nos permite adentrarnos en el planteamiento primordial que tuvo que dilucidar el foro apelado para disponer de la causa de acción ante su consideración. Aludiendo a la sección 1.01 del *Acuerdo de Fusión*, Triple-S afirmó allí que; "el 23 de agosto de 2021, Triple-S, GuideWell Merger, Inc. ("GuideWell"), y GuideWell Mutual Holdings Corporation suscribieron un documento intitulado Agreement and Plan of Merger, conforme al cual GuideWell viabilizó su fusión con Triple-S, **siendo ésta última la entidad superviviente de dicha transacción**"[68]. (Énfasis provisto).

Examinado el lenguaje contenido en la referida sección 1.01 del Acuerdo de Fusión[69], opinamos que el asunto no merece mayor elucidación pues, en efecto, expresamente se dispuso que la corporación

---

[68] Entrada Núm. 79 de SUMAC, pág. 27.
[69] Apéndice el recurso de apelación, pág. 644.

superviviente en la fusión sería Triple-S, lo que no pudo ser contrariado de forma alguna por la parte Apelante, ni tampoco requiere de prueba ulterior para su interpretación. Este hecho debe ser considerado en conjunto con las subsiguientes secciones 1.03 y 1.04 del mismo Acuerdo de Fusión, a los fines de que; las obligaciones allí contenidas responderían a las disposiciones de la Ley de Corporaciones de Puerto Rico, (sección 1.03 del Acuerdo de Fusión); y que, "all the property, rights, privileges, powers and fanchises of the Company and Merger Sub will vest in the Surviving Corporation, and all debts, liabilities and duties of the Company and Merger Sub Will become the debts, liabilities an duties of the Surviving Corporation", (sección 1.04 del Acuerdo de Fusión)[70]. Como enfatizamos en la oración final del párrafo precedente, esta cita en el idioma inglés establece sin ambigüedad que Triple-S resultaría en la corporación superviviente de la fusión.

De tal hecho se sigue que Triple-S, como corporación superviviente, ostenta los derechos que el propio Acuerdo de Fusión le reconoce, y que además resultan acordes con los reconocidos en la legislación especial de corporaciones atinentes a las fusiones. Así, el Art. 10.10 de la Ley de Corporaciones, que por su centralidad citamos en integridad, dispone lo que sigue:

> Artículo 10.10. — Personalidad jurídica, derechos, responsabilidades de corporaciones constituyentes o de corporaciones que subsistan o se originen de una fusión o consolidación.
>
>> Cuando cualquier consolidación o fusión se haga efectiva con arreglo a los requisitos de esta Ley, para todos los efectos de las leyes del Estado Libre Asociado, se extinguirá la personalidad jurídica aislada de todas las corporaciones constituyentes que fueren parte en el acuerdo, salvo la de la que hubiere absorbido por fusión a la otra u otras, según sea el caso. Las corporaciones constituyentes se convertirán en una nueva corporación **o se fusionarán en una de tales corporaciones**, según sea el caso, con todos los derechos, privilegios, facultades y franquicias, de índole tanto pública como privada, y sujeta a todas las restricciones, incapacidades y deberes de cada una de tales corporaciones fusionadas o consolidadas. **Todos los derechos, privilegios, poderes y franquicias de cada una de tales corporaciones, y todos los bienes, muebles e inmuebles, y**

---

[70] Id, pág. 645.

**todos los créditos, por cualquier concepto a favor de cualquiera de tales corporaciones constituyentes, tanto respecto de suscripciones de acciones como de derechos o bienes reclamables o pertenecientes a cada una de tales corporaciones**, pasarán a la corporación que se origine de la consolidación **o que subsista de la fusión. Todos los bienes, derechos, privilegios, facultades y franquicias y, sin excepción, todo otro interés pasará consiguientemente al patrimonio de la corporación** que se origine **o que subsista**, con el mismo alcance que tenían en los respectivos patrimonios de cada corporación constituyente. El título de cualesquiera bienes inmuebles adquiridos por escritura u otro modo, con arreglo a las leyes del Estado Libre Asociado, por cualquiera de tales corporaciones constituyentes, no revertirá ni sufrirá menoscabo alguno por razón de este Artículo. De manera similar, subsistirán sin menoscabo alguno todos los derechos de los acreedores y todos los gravámenes sobre cualesquiera bienes de cualquiera de las corporaciones constituyentes. Todas las deudas, obligaciones y deberes de las respectivas corporaciones constituyentes serán en adelante deudas, obligaciones y deberes de la corporación que se origine por la consolidación o que subsista a la fusión, y le serán exigibles como si tales deudas, obligaciones y deberes hubieren sido contraídos por ésta. 14 LPRA sec. 3740. (Énfasis provisto).

La lectura conjunta de las secciones del Acuerdo de Fusión citadas y el Art. 10.10 de la Ley de Corporaciones, supra, necesariamente conducen a la conclusión de que, como corporación sobreviviente, Triple-S mantuvo su personalidad jurídica, sin que resultara afectada por la fusión, lo que supuso también conservar sus *bienes, derechos, privilegios, facultades y franquicias*, sin que propiamente interviniera una transferencia de activos, (acciones dentro de estas), a causa de que tornara en subsidiaria de GuideWell Mutual.

No obstante, la parte Apelante sostuvo ante el TPI, y reitera ante nosotros, que como resultado de dicha fusión lo que aconteció fue una *transferencia indirecta,* en tanto que GuideWell Mutual, como empresa matriz, *asumió el control* de Triple-S como subsidiaria, lo que activó las restricciones y derechos contenidos en el Artículo III del Acuerdo de Accionistas.

La aseveración que precede se confronta con la indefinición de lo que constituye una *transferencia indirecta* en el contexto del Acuerdo de Accionistas. Como mencionamos en el recuento procesal, no existe controversia real respecto a que el *Acuerdo de Accionistas* no incluyó una

definición de lo que constituye una *transferencia directa o indirecta*. Más bien, la Sección 1.02 del *Acuerdo de Accionistas*, se limita a establecer que una transferencia significa:

> "... any direct o indirect transfer, donation, sale, assignment, pledge, hypothecation, grant of a security interest in, or other disposal or attempted disposal of, all or any portion of a Share, any interest or rights in a Share, or any rights under this Agreement[71].

De aquí que las partes se muestren contestes en que la acepción de "transfer" no distingue una transferencia directa *vis a vis* transferencia indirecta, a pesar de las consecuencias que dicho concepto pudiera acarrear, según estas son previstas en el Artículo III del Acuerdo de Accionistas[72]. De esta manera, la sección 3.01 del Acuerdo de Accionistas dispone una restricción general sobre la transferencia de las acciones, salvo cuando acontezcan algunas de las circunstancias plasmadas en las subsiguientes secciones del mismo Artículo III.

A renglón seguido, en la sección 3.02(a) del Acuerdo de Accionistas se dispone, en lo pertinente, que ... *ningún accionista podrá directa o indirectamente transferir toda o cualquier porción de las acciones a cualquier persona, salvo por los supuestos permitidos en las secciones subsiguientes*[73]. (Traducción nuestra). Luego, en la Sección 3.03 del mismo documento se estableció el *Right of First Refusal,* o derecho de tanteo, disponiéndose, en lo que concierne, que solamente aplicaría a las ofertas de compra de buena fe de un tercero, para adquirir la totalidad o parte de las acciones en poder de un accionista, sujeto a las condiciones establecidas en esta misma sección. De esta manera, si la transferencia o venta incumpliera con los términos del Acuerdo de Accionistas, sería declarada nula *ab initio,* en cuyo caso se activaría el derecho de tanteo o compra preferente. Además, se dispone que:

> [...] *the Company and the other parties hereto shall have, in addition to any other legal or equitable remedies which they may have, the right to enforce the provisions of this Agreement by actions for specific*

---

[71] Apéndice del recurso de apelación, pág. 466.
[72] Id, págs. 471-477.
[73] Id., pág. 471.

*performance (to the extent permitted by law); and the Company shall have the right to refuse to recognize any Transferee as one of its Shareholders for any purpose*". Sección 3.07[74].

Entonces, ante la ausencia de una definición sobre lo que constituye *transferencia indirecta,* los Apelantes esgrimen, como dijimos, que esta se configura una *vez se transfiere el control de la entidad que posee las acciones* (Triple-S), a otra, (GuideWell Mutual), transfiriéndose más del 50% de las acciones a un tercero, convirtiéndose así este tercero en quien verdaderamente las controla. La misma parte aseveró que esta concepción sobre *transferencia indirecta* fue acordada en una reunión de accionistas de NeoDeck, cuyas incidencias fueron recogidas en Minuta del 21 de junio de 2016[75]. Según esta teoría legal, el acuerdo allí alcanzado tuvo el efecto de enmendar el Acuerdo de Accionistas, a los fines de definir el término *indirect transfer* bajo los términos descritos[76]. De esta manera, la parte Apelante impulsa que la fusión en la que participó Triple-S constituyó una violación del Acuerdo de Accionistas, al ocurrir la descrita transferencia indirecta (transferencia del control), activando así su derecho a tanteo o compra preferente, lo que, además, justificaba la revocación y cancelación de las acciones de Triple-S.

Sin embargo, al así pronunciarse sobre la presunta enmienda al Acuerdo de Accionistas, que dio lugar a la definición de *indirect transfer,* apreciamos que la parte Apelante eligió desatenderse o no explicar de manera frontal el efecto de la Sección 7.03 contenida en el mismo Acuerdo, ante tal propuesta legal[77]. Esta Sección dispone expresamente que los términos del Acuerdo de Accionista solamente pueden ser enmendados **con el previo consentimiento por escrito de Triple-S,** mientras este sea accionista de ND Holdings. Por tanto, la parte que promovía la ocurrencia de la enmienda al Acuerdo de Accionistas, para

---

[74] Id, pág. 472.

[75] Id, págs. 1613-1614.

[76] Para precisar las ocurrencias de dicha reunión y el contenida de la Minuta, refiérase al inciso noveno de las determinaciones de hechos alcanzadas por el TPI en la Sentencia apelada, según fue aquí reproducido en el tracto procesal.

[77] Id, pág. 497.

incorporar una definición de los que constituía una transferencia indirecta, estaba llamada a establecer mediante prueba documental el cumplimiento con el requisito de la Sección 7.03 aludida. Con mayor especificidad, al atender el contenido de la Sección 7.03 bajo examen, cabía esperar que, de haber obrado alguna enmienda al Acuerdo de Accionistas, de algún documento escrito surgiera en qué consistía la presunta enmienda, y constara el consentimiento de las partes. Sin embargo, del expediente ante nosotros no logramos localizar un documento tal y, tal como lo concluyó el TPI, aun admitiendo la Minuta de 21 de junio de 2016 aludida, y su contenido, como prueba documental a ser sopesada para fines de considerar la presunta enmienda al Acuerdo de Accionistas, las reputamos insuficiente en derecho para tal propósito.

Aunque resulte reiterativo, es evidente que la Sección 7.03 citada establece sin ambages que las enmiendas al Acuerdo de Accionistas deben contar con la aprobación previa y por escrito de Triple-S. Auscultada la referida Minuta, no podemos interpretar que lo allí manifestado por uno de los representantes de Triple-S, el señor Martorell, cumpliera con el rigor de una enmienda al Acuerdo de Accionistas. ¿En dónde surge propiamente el "written consent" de las partes en dicho documento? ¿Qué firma o, al menos, inicial muestra el consentimiento de Triple-S para dar por enmendado el Acuerdo de Accionista en los términos allí conversados? ¿En qué documento se encuentra la alegada *ratificación* de la enmienda al Acuerdo de Accionistas por representantes de las partes? La parte Apelante tuvo oportunidad de presentar prueba documental, en su moción de sentencia sumaria y oposición a la sentencia sumaria de Triple-S, para establecer el cumplimiento con el requerimiento dimanante de la Sección 7.03 bajo discusión, pero tan solo pudo ofrecer la referida Minuta[78].

---

[78] Al así decir, no obviamos la declaración jurada suscrita por el CPA Carlos Iglesias, de 29 de julio de 2024, según ofrecida por la parte Apelante para ilustrar sobre el significado de lo que constituye una transferencia indirecta en el contexto de este tipo de fusiones. Sin embargo, juzgamos que, para acoger la definición que del concepto transferencia indirecta ofrece el referido perito en el inciso 22 de su declaración jurada, habría de

En consecuencia, no podemos acoger la propuesta del concepto *transferencia indirecta* impulsada por la parte Apelante como obligatorio entre las partes, por causa de una presunta enmienda al Acuerdo de Accionista que no cumplió con el requerimiento de la Sección 7.03. Por lo mismo, tampoco podemos adjudicar que hubiese acontecido una transferencia indirecta por virtud de la fusión de la que formó parte Triple-S, en tanto ello comportaría admitir la enmienda al Acuerdo de Accionista que hemos rechazado por falta de prueba documental que la sostenga. Esto derrota la alegación de que, por motivo de intervenir una transferencia indirecta se activaran los derechos contemplados en la Sección III del Acuerdo de Accionistas. Es decir, aun partiendo del hecho de que como empresa matriz GuideWell asumió el control de la subsidiaria Triple-S, esto, de suyo, no supuso que aconteciera uno de los supuestos que daba lugar a la activación de las restricciones contenidas en la Sección III del Acuerdo de Accionistas, subsistiendo esta última corporación con su personalidad jurídica, que entraña derechos y obligaciones bajo el Art. 10.10 de la Ley de Corporaciones. En consecuencia, juzgamos que no incidió el foro *a quo* al declarar no ha lugar la Demanda Enmendada que presentó ND Holdings y decretar que la fusión de Triple-S y GuideWell no implicó una transferencia directa o indirecta de las acciones de Triple-S en ND Holdings, que activara los derechos de compra preferente.

Por último, los Apelantes cuestionan que el TPI no le permitiera hacer descubrimiento de prueba antes de responder a la *Moción de Sentencia Sumaria Parcial* que presentó Triple-S.

Por una parte, bien puede señalarse que la resolución interlocutoria en la que el TPI denegó la referida solicitud de descubrimiento de prueba

---

partirse de que las partes acordaron tal acepción, ateniéndose al cumplimiento de la sección 7.03 del Acuerdo de Accionistas aludida, lo que aquí faltó. En este sentido, la parte Apelante trató de proveer mediante dicha declaración jurada la documentación que no pudo presentar acerca de la promovida enmienda al Acuerdo de Accionistas, y el referido perito nada podía contribuir en la determinación sobre si las partes cumplieron con los requerimientos para enmendar al Acuerdo de Accionistas.

se le notificó a la parte Apelante el 24 de julio de 2024, de la que bien pudo haber recurrido ante nosotros de manera oportuna, pero optó por no hacerlo.[79] Por la otra, juzgamos que, tanto el TPI, como este foro intermedio, contamos con la documentación esencial para dirimir la controversia medular, para lo cual podía prescindirse de evidencia testifical extrínseca, como la de los testimonios de las personas que se solicitó deponer.

En definitiva, coincidimos con la disposición de la Sentencia apelada y sus fundamentos, por lo que cabe Confirmar.

## IV. Parte dispositiva

Por los fundamentos que anteceden, se confirma la *Sentencia Parcial* apelada.

Lo pronunció y manda el Tribunal y lo certifica su Secretaria. La jueza Santiago Calderón emitió voto particular de conformidad.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[79] Véase, Entrada 62 en SUMAC, caso núm. SJ2024CV02511.

Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
Panel Especial

| NEODECK HOLDING CORP.<br>NEODECK SOFTWARE CORP.<br><br>Apelantes<br><br>v.<br><br>TRIPLE-S MANAGEMENT, CORP.;<br>THURMAN JUSTICE; COMPAÑÍA<br>DE SEGURO B<br><br>Apelados<br><br><br><br>TRIPLE-S MANAGEMENT, CORP.<br><br>Apelado<br><br>v.<br><br>ROBERTO TORRES; RICARDO<br>PINEDA THEN; Y NEODECK<br>HOLDINGS CORP.<br><br>Apelantes | KLAN202401142 | *Certiorari*<br>procedente del<br>Tribunal de<br>Primera Instancia,<br>Sala de San Juan<br><br>Caso. Núm.<br>SJ2024CV02511<br><br>Sobre:<br>Declaración y Daños<br><br>Consolidado<br><br><br><br>*Certiorari*<br>procedente del<br>Tribunal de<br>Primera Instancia,<br>Sala de San Juan<br><br>Caso. Núm.<br>SJ2024CV03325<br><br>Sobre:<br>Injunction Estatutario<br>al Amparo de los<br>Artículos 7.01 (D),<br>7.10 y 7.15 de la Ley<br>General de<br>Corporaciones |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Adames Soto y la Jueza Santiago Caderón

**VOTO PARTICULAR DE CONFORMIDAD
DE LA JUEZA SANTIAGO CALDERÓN**

En San Juan, Puerto Rico, a 15 de diciembre de 2025.

Estoy conforme con el resultado alcanzado expuesto en la *Sentencia* mayoritaria. Es norma reiterada que este Tribunal revisa de *novo* la prueba documental, por lo que se encuentra en igual posición que el Tribunal de Primera Instancia. Correctamente establece la Sentencia que emite este Foro Intermedio que, al examinar la *Moción de Sentencia*



*Sumaria* instada por Triple-S, *determinamos que tiene razón la parte Apelante al afirmar que, en un buen número de los hechos propuestos como incontrovertidos, esta no se ajustó al cumplimiento estricto de la Regla 36.3(a)(4), supra.*

No obstante, tras un examen minucioso del expediente y las mociones presentadas por las partes, a saber: *Moción de Sentencia Sumaria Parcial*[1], *Oposición a Moción de Sentencia Sumaria Parcial y Solicitud de Sentencia Sumaria Parcial*[2] y *Moción Informativa Sobre Exhibits Estipulados Con Relación a Caso Civil Número SJ2024cv03325*[3] el Exhibit 5, parte 1 y 2) *"Shareholders Agreement by among Neodeck Holdings Corp. and the Shareholders named herein, dated as August 2, 2010*[4]*", Agreement and Plan of Merger dated as of August 23, 2021, among Guidewell Mutual Holding Corporation, Guidewell Merger, Inc. and Triple–S Management Corporation*[5], entre otros, razono al igual que la mayoría del panel que, Triple-S sí proveyó la prueba documental necesaria y adecuada para disponer de las controversias de derecho existentes y así facilitar la solución justa, rápida y económica de este caso[6].

Sin embargo, estimo necesario destacar que, el ordenamiento jurídico establecido en la *Ley General de Corporaciones*, Ley 164-2009, en específico, con los Artículos 1.03, 10.01 10.02, 10.03, 1010[7], instituyen el proceso legal para Fusión o Consolidación de Corporaciones.

Apuntalamos que, la *Ley General de Corporaciones* dispone que las corporaciones domésticas y foráneas deben presentar ante el Secretario de Estado un certificado de fusión y, una vez aprobado o archivado por el Departamento de Estado, entra en vigor la corporación que subsiste o la nueva entidad según el caso aplicable. Al inspeccionar la página

---

[1] SUMAC TPI, entrada núm. 38.
[2] SUMAC TPI, entrada núm. 63
[3] SUMAC TPI, entrada núm. 35 Exhibit 1-27.
[4] SUMAC TPI, entrada núm. 35 Exhibit 1.
[5] SUMAC TPI, entrada núm. 35 Exhibit 5 partes 1 y 2.
[6] *Rodríguez García v. UCA*, 200 DPR 929, 940 (2018); *Bobé et al. v. UBS Financial Services*, 198 DPR 6, 20 (2017); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013).
[7] 14 LPRA, secciones 3503, 3733, 3734 y 3740.

cibernética del Departamento de Estado del Gobierno de Puerto Rico[8], consta que, el 31 de enero de 2022, Triple-S sometió los documentos requeridos en las secciones que preceden para así dar cumplimiento con la *Ley General De Corporaciones* y con la *Ley General de Corporaciones de Delaware*[9]. Así pues, el 3 de febrero de 2022, el Secretario de Estado emitió el Certificado de Fusión con sus anejos correspondientes. Al revisar los anejos surge cual es el negocio jurídico entre las partes[10]. Dicho lo anterior, al aquilatar cada anejo, es un hecho incontrovertido que hubo una fusión entre Triple-S y *Guidewell Merger, Inc.*, y el resultado de dicha fusión es que Triple-S resultó ser la entidad superviviente, por lo cual, subsiste su personalidad jurídica con sus responsabilidades y obligaciones.

Ante dicho escenario y tras un examen meticuloso de la *Moción de Sentencia Sumaria Parcial*[11] presentada por Triple S, la *Solicitud de Sentencia Sumaria Parcial*[12] presentada por NeoDeck Holdings, Corp., el Sr. Roberto Torres y el Sr. Ricardo Pineda Then y a la cual se unió ND Software[13] y las correspondientes *Oposiciones* presentadas por las partes, colegimos que, al igual que la mayoría de este panel, no existen hechos materiales en controversia o que pudiesen afectar el resultado de las reclamaciones de acuerdo con el derecho sustantivo aplicable. Por consiguiente, la parte apelante no logró establecer que existe una controversia que sea real para derrotar una solicitud de sentencia sumaria. Le correspondía controvertir los hechos propuestos por Triple-S. En otras palabras, las declaraciones juradas, la Minuta del 2016 ni el



---

[8] Tomamos conocimiento judicial conforme con las Reglas de Evidencia de Puerto Rico de 2009 32 LPRA Ap. VI, R. 201 y 202.
[9] 8 Del. C. 1953, § 252 es de aplicación a *Guidewell Merger, Inc.*
[10] **Certificate of Merger of Guidewell Merger Inc., a Delaware Corporation with and into Triple S Management Corporation a Puerto Rico corporation, en la cual se explica que Triple S es la corporación sobreviente. Certificate of Corporate Secretary de Triple S el cual establece la Resolución No. TSM-2021-08-21 emitida que consigna clara y expresamente el modo y los términos de la misma entre la empresa matriz GuideWell Mutual Holding Corporation a Florida not-for-profit mutual insurance holding company y la subsidiaria Triple-S.**
[11] SUMAC TPI, entrada núm. 38.
[12] SUMAC TPI, entrada núm. 63.
[13] SUMAC TPI, entrada núm. 84.

Acuerdo de Accionista sometidos por la parte apelante sustentan su postura ni tampoco arrojan duda sobre los hechos materiales y la prueba presentada por Triple-S.

A la luz de lo anteriormente expuesto, estoy de acuerdo con la Sentencia que emite este Foro Intermedio.

Grisel M. Santiago Calderón
Jueza de Apelaciones